**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| GARY CLARK, | : | CIVIL ACTION NO. |
| Plaintiff | : | 3:15-CV-00304 (JCH) |
| | : | |
| v. | : | |
| | : | |
| STOP & SHOP SUPERMARKET CO., | : | AUGUST 15, 2016 |
| Defendant. | : | |

**RULING RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 38)**

**I.      INTRODUCTION**

Plaintiff Gary Clark ("Clark"), a former employee of defendant Stop & Shop Supermarket Co. ("Stop & Shop"), initiated this lawsuit on March 2, 2015, seeking damages for Stop & Shop's alleged violations of state and federal law.  See Compl. (Doc. No. 1).  Specifically, Clark alleges that Stop & Shop discriminated against him, retaliated against him, and ultimately terminated him because of his disabling mental health conditions.  See id.  Clark's Complaint charges:  (1) disability discrimination in violation of section 46a-60(a)(1) of the Connecticut General Statutes and the federal Americans with Disabilities Act ("ADA"), see 42 U.S.C. 12101 et seq.; (2) negligent misrepresentation; (3) retaliation in violation of the federal Family Medical Leave Act ("FMLA"), see 29 U.S.C. 2612 et seq.; and (4) interference with leave in violation of the FMLA, see Compl. at 7-9 (Doc. No. 1).  Stop & Shop answered Clark's Complaint, denied the allegations, and presented various affirmative defenses.  See Def.'s Answer and Affirmative Defenses ("Answer") (Doc. No. 15).

Currently pending before the court is Stop & Shop's Motion for Summary Judgment.  See Def.'s Mot. for Summ. J. ("MFSJ") (Doc. No. 38).  Clark opposed Stop & Shop's Motion, see Pl.'s Objection to Def.'s Mot. for Summ. J. ("Pl.'s Opp.") (Doc. No.

1

43), to which Stop & Shop timely replied, see Reply Mem. of Law in Supp. of Mot. for Summ. J. ("Def.'s Reply") (Doc. No. 44).

After careful review of the submissions of the parties, and for the reasons that follow, the court now **GRANTS IN PART** and **DENIES IN PART** Stop & Shop's Motion for Summary Judgment (Doc. No. 38).

## II.     FACTUAL BACKGROUND[1]

Stop & Shop hired Clark as a full-time produce clerk in December 2008.  See Report of Parties' Rule 26(f) Planning Meeting ("Rule 26(f) Report") at 4 (Doc. No. 16). Clark was originally hired to work at a Stop & Shop location in Stamford, Connecticut. See Def.'s Local Rule 56(a)1 Statement ("Def.'s L.R. 56(a)1 Stmt.") at 1 ¶ 3 (Doc. No. 40).  Clark was promoted to the position of assistant produce manager in April 2010, and he was transferred to a Stop & Shop store in Darien, Connecticut in March 2011. See Rule 26(f) Report at 4 (Doc. No. 16).  As an assistant produce manager, Clark worked mostly day shifts, but was required to work one night shift per week.  See Def.'s L.R. 56(a)1 Stmt. at 2 ¶ 8 (Doc. No. 40).

In June 2012, Clark decided to return to being a full-time produce clerk, and he was transferred back to Stamford.  See Def.'s L.R. 56(a)1 at 2 ¶ 13 (Doc. No. 40).  Clark was upset with this transfer, because he believed that the store manager in Darien had promised him that he would be transferred to a Stop & Shop location closer to his home if he stepped down from the assistant manager position.  See Pl.'s Local Rule 56(a)2

---

[1] Unless otherwise noted, the parties have indicated that these facts are undisputed, either in their Statement of Undisputed Facts accompanying their Rule 26(f) Report (Doc. No. 16), or by statements in their respective Local Rule 56(a) filings (Doc. Nos. 40 & 43-1).  Only those facts necessary to resolve the pending Motion are discussed herein.  Additional facts, including those facts the parties dispute, are discussed as necessary in the analytical section of this Ruling.  See infra at 6-27.

Statement ("Pl.'s L.R. 56(a)2 Stmt.") at 2 ¶ 11, 4 ¶ 15 (Doc. No. 43-1). Clark had moved from Bridgeport to Ansonia at some point after he started working for Stop & Shop but before he was transferred back to Stamford. See id. at 2 ¶ 5. Clark moved to Ansonia to live with, and provide assistance to, his disabled mother after his stepfather died in 2009. See id.

After arriving in Stamford, Clark informed the produce manager for whom he would be working, Abdul Bangi ("Bangi"), that he suffered from, and took medicine for, anxiety. See Def.'s L.R. 56(a)1 Stmt. at 3 ¶ 16 (Doc. No. 40). Bangi was responsible for scheduling Clark, and he consistently scheduled him to work all "night" shifts (i.e., shifts between 3:00 PM and 12:00 PM). See id. at 3 ¶¶ 17-20. Clark was generally scheduled to work from 1:30 PM to 10:00 PM. See id. at 3 ¶ 18. Clark regularly asked Bangi to stop scheduling him exclusively for night shifts; Bangi told Clark to speak with store manager Robert Silver ("Silver") or human resources. See id. at 4 ¶ 22; Pl.'s L.R. 56(a)2 Stmt. at 5 ¶ 22 (Doc. No. 43-1).

In February 2013, Clark's doctor, Lazaro Pomeraniec ("Dr. Pomeraniec"), faxed a note to the Stamford Stop & Shop indicating that Clark could not work night shifts due to illness. See Def.'s L.R. 56(a)1 Stmt. at 4 ¶ 25 (Doc. No. 40). The illnesses in question are psychiatric in nature, as Clark has suffered from, and received treatment for, panic attacks, agoraphobia, and anxiety disorder throughout his adult life. See Compl. at 2 ¶¶ 8-9 (Doc. No. 1); see also Attending Physician's Statement of Disability (Doc. No. 43-4). After receiving this note, Stop & Shop, through human resources manager Julie Pinard ("Pinard"), scheduled a meeting with Clark and union representative Jason Dokla ("Dokla"). See Def.'s L.R. 56(a)1 Stmt. at 4 ¶ 28 (Doc. No. 40). Clark and Pinard

disagree about what happened in that meeting, compare id. at 4 ¶ 29 – 5 ¶ 38, with Pl.'s L.R. 56(a)2 Stmt. at 6 ¶ 29 – 7 ¶ 38 (Doc. No. 43-1), but the end result was that Clark requested FMLA leave in March 2013, see Def.'s L.R. 56(a)1 Stmt. at 5 ¶ 40 (Doc. No. 40).  Clark's FMLA statement represented that he had a serious health condition that rendered him unable to work; he expected to return six months later, in September 2013.  See id. at 6 ¶ 41.  Clark's leave was approved by Stop & Shop.  See id. at 6 ¶ 43. During the course of Clark's FMLA leave, Dr. Pomeraniec provided additional notes to Stop & Shop that stated that Clark could return to work if he was scheduled to work days instead of nights.  See Note from Lazaro N. Pomeraniec, M.D. ("Dr. Pomeraniec Note #1") (Doc. No. 43-9).

In late August 2013, Dr. Pomeraniec faxed Stop & Shop a note indicating that Clark could return to work in September 2013, so long as he was scheduled to work no more than one night shift per week and was transferred to a Stop & Shop location closer to his home.  See Def.'s L.R. 56(a)1 Stmt. at 6 ¶ 44 (Doc. No. 40).  Stop & Shop offered to transfer Clark to Norwalk, which was slightly closer to his home than Stamford was, but informed Clark that he would remain assigned to night shifts.  See id. at 7 ¶ 48.  On the day that Clark was scheduled to return to work, Dr. Pomeraniec faxed Stop & Shop another note that stated that Clark had not come back to work because his disabilities were not being accommodated.  See id. at 7 ¶ 50.  Stop & Shop called Clark to request additional information, including how late he could work, how far from his home he could work, and whether the restrictions were temporary or permanent.  See id. at 7 ¶ 51. Over the next several months, Dr. Pomeraniec sent additional, clarifying notes to Stop & Shop in response to Stop & Shop's repeated requests for more information.  See id. at 7

¶ 53 (September 30, 2013), 8 ¶ 62 (November 13, 2013).  Clark did not return to work during these discussions.  See id. at 9 ¶ 67.  Clark believed that Stop & Shop terminated his employment in November 2013, although he did not receive a formal, written termination notice at that time.  See id. at 9 ¶ 69.

Stop & Shop next contacted Clark in May 2014, which was more than a month after he had filed complaints regarding his treatment by Stop & Shop with the Equal Employment Opportunity Commission ("EEOC") and the Connecticut Commission on Human Rights and Opportunities ("CHRO").  See id. at 10 ¶ 74; 12 ¶ 92.  Clark did not respond to Stop & Shop's communications in the late spring and early summer of 2014, and Stop & Shop notified Clark, in writing, that he was terminated effective June 30, 2014.  See id. at 11 ¶ 87.

## III.    STANDARD OF REVIEW

On a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000). Once the moving party has met its burden, in order to defeat the motion, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 256, and present such evidence as would allow a jury to find in his favor, see Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

In assessing the record to address whether there are material issues of fact, the trial court must draw all inferences in favor of the party against whom summary judgment is sought.  See Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38.

Summary judgment "is properly granted only when no rational finder of fact could find in favor of the non-moving party."  Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000).  "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised, on the basis of the evidence presented, the question must be left to the finder of fact.  Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

## IV.  DISCUSSION

Stop & Shop argues that it is entitled to judgment as a matter of law on each of the counts set forth in Clark's Complaint.  The court will consider Stop & Shop's arguments with respect to each of the counts separately and in turn.

### A.  Count One: Disability Discrimination and Failure to Accommodate

The first count of Clark's Complaint alleges that Stop & Shop violated the Connecticut Fair Employment Practices Act ("CFEPA") and the ADA when Stop & Shop failed to accommodate Clark's disabilities and terminated his employment because of his disabilities.  See Compl. at 7 (Doc. No. 1).  Stop & Shop contends it is entitled to summary judgment on this claim because (1) Clark was not disabled within the meaning of the ADA; (2) Clark cannot show that Stop & Shop failed to accommodate his alleged disabilities; and (3) Clark cannot show that his termination was due to his alleged disabilities.  See Mem. of Law in Supp. of Mot. for Summ. J. ("Def.'s MFSJ Mem.") at 11-27 (Doc. No. 39).  For the reasons that follow, the court concludes that there are genuine issues of material fact relevant to the resolution of each of the points raised by Stop & Shop.  Thus, Stop & Shop is not entitled to judgment as a matter of law on this claim.

6

Both state and federal claims that an individual has been the victim of discrimination on the basis of a disability are analyzed under the familiar burden-shifting framework outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). See McMillan v. City of New York, 711 F.3d 120, 125 (2d Cir. 2013); Feliciano v. Autozone, Inc., 316 Conn. 65, 73-74 (2015) ("We look to federal law for guidance on interpreting state employment discrimination law, and the analysis is the same under both.").[2]  Under this framework, "[a] plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext."  Sista v. CDC Ixis North America, Inc., 445 F.3d 161, 169 (2d Cir. 2006).

Establishing a prima facie case of discriminatory discharge under the ADA requires a plaintiff to show, by a preponderance of the available evidence, that: "(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability."  McMillan, 711 F.3d at 125 (internal quotations and citation omitted). Similarly, a viable failure to accommodate claim requires a plaintiff to demonstrate that: "(1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation,

---

[2] In light of the Connecticut Supreme Court's statement that analysis of employment discrimination claims is the same under both federal and state law, as well as the practice of the Connecticut courts to "look to federal law for guidance on interpreting state employment discrimination law," Feliciano, 316 Conn. at 73, in the following analysis the court generally looks to federal law relevant to Clark's claims.  However, the court is aware that Clark has pled his claims under both federal and state law, and nothing in this discussion should be viewed as overlooking that fact.

plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations."  Id. at 125-26 (internal quotations and citation omitted).

Stop & Shop does not contend that it is not subject to the ADA, that it lacked notice of Clark's disabilities, or that Clark was not qualified to perform his job.  Stop & Shop does, however, dispute that there are genuine issues of material fact on the remaining elements of Clark's discriminatory discharge and failure to accommodate claims.  See Def.'s MFSJ Mem. at 11-27 (Doc. No. 39).  The court considers each of Stop & Shop's arguments separately and in turn.

### 1.    Whether Clark is Disabled

Stop & Shop first contends that it is entitled to judgment as a matter of law on Clark's discriminatory discharge and failure to accommodate claims because Clark is not disabled for purposes of state and federal employment law.  See id. at 11-14. Under the ADA,[3] "disability" means "(A) a physical or mental impairment that substantially limits one or more major life activities . . . ; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(1).  The ADA further provides that "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating,

---

[3] The definition of "disability" for purposes of the CFEPA is broader than the ADA definition recited here.  See C.G.S.A. § 46a-51(15), (20).  In fact, "[t]he only relevant difference between the analysis a court undertakes in regards to ADA and CFEPA claims is in defining physical disability." Hopkins v. New England Health Care Employees Welfare Fund, 985 F. Supp. 2d 240, 256 (D. Conn. 2013).  But because the court concludes "there is a genuine issue of fact whether [Clark] was disabled under the ADA at the time he was discharged, it necessarily concludes that the same issue of fact exists regarding whether he was disabled under the CFEPA.  DeAngelo v. Yellowbook Inc., 105 F. Supp. 3d 166, 180 (D. Conn. 2015) (collecting cases).

thinking, communicating, and working." Id. at § 12102(2)(A).  The definition of disability codified in the ADA is to "be construed in favor of broad coverage of individuals" under the ADA, "to the maximum extent permitted" by the ADA's terms.  Id. at § 12102(4)(A). In particular, the requirement that a disability "substantially limit[ ]" the performance of one or more major life activities "is not meant to be a demanding standard."  29 C.F.R. § 1630.2(j)(1)(i); see also Parada v. Banco Industrial De Venezuela, C.A., 753 F.3d 62, 68 n.3 (2d Cir. 2014) (noting that the EEOC has clarified that "[a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting" (quoting 29 C.F.R. § 1630.2(j)(1)(ii)).  Thus, the determination of whether an individual is substantially limited in the performance of a major life activity "usually will not require scientific, medical, or statistical analysis."  29 C.F.R. § 1630.2(j)(1)(v).

Clark contends that he is disabled within the meaning of the ADA because his mental disabilities, i.e., his "anxiety disorder, panic attacks, agoraphobia, and depression," substantially limit his ability to engage in the major life activities of sleeping, concentrating, working, and communicating.  Pl.'s Opp. at 20-22 (Doc. No. 43).  After careful review of the record, the court agrees with Clark that there are genuine and disputed issues of material fact with respect to this element of Clark's claims.

Clark has produced doctor's notes and records that corroborate his testimony that he has suffered from the aforementioned mental impairments—and has taken prescribed medication for them—throughout his adult life.  See, e.g., Dep. of Gary Clark ("Clark Dep.") at 43:18-52:6 (Doc. No. 39-2); Attending Physician's Statement of

Disability (Doc. No. 43-4); Dr. Pomeraniec Note #1 (Doc. No. 43-9); Note from Lazaro

N. Pomeraniec, M.D. ("Dr. Pomeraniec Note #2") (Doc. No. 43-10).  Notably, Stop &

Shop does not argue that Clark does not suffer from the ailments he claims, instead

contending that Clark has not produced sufficient evidence that his claimed disabilities

substantially limit his ability to engage in a major life activity.  See Def.'s MFSJ Mem. at

11-14 (Doc. No. 39).  But the record is replete with evidence that Clark's disabilities

made it difficult—if not impossible[4]—for him to work a job that required all night shifts or

a commute of more than 20 miles, as well as affected his ability to sleep, eat, and

concentrate.  See, e.g., Clark Dep. at 48:12-49:14 (Doc. No. 39-2) (noting, inter alia,

that his anxiety made it "hard to focus" at work and that he would therefore "forget

things"); id. at 42:6-9 (stating that he told Stop & Shop "that working nights . . . was

causing [him] a lot of anxiety" and that he "felt like [he] couldn't do the job performance

as well being under so much stress"); Attending Physician's Statement of Disability

(Doc. No. 43-4) (noting that Clark suffers from "anxiety when works nights"); Dr.

Pomeraniec Note #1 (Doc. No. 43-9) (stating that Clark's disabilities will prevent him

from working from March 15, 2013 through June 1, 2013, but that Clark can return to

work when he is assigned day shifts); Dr. Pomeraniec Note #2 (Doc. No. 43-10) (stating

that Clark's disabilities will prevent him from working March 15, 2013 through July 1,

2013); Letter from Dr. Pomeraniec (Doc. No. 43-16) (stating that Clark cannot work

more than one night shift per week and cannot commute more than 20 miles to work

due to his anxiety).  Drawing all inferences in Clark's favor, this evidence is sufficient to

---

[4] Indeed, the mere fact that Clark had to take an extended leave of absence from his job because of his disabilities and on medical advice supports a strong inference that Clark's disabilities substantially limited his ability to engage in the major life activity of working.

create "genuine issue[s] for trial," Anderson, 477 U.S. at 256, with respect to whether

Clark's alleged disabilities substantially limit his ability to engage in the major life

activities he references, see Parada, 753 F.3d at 68 n.3 (noting that the ADA standard

is not meant to be demanding).

2.    Whether Stop & Shop Failed to Accommodate Clark's Alleged
      Disabilities

Stop & Shop's second argument in favor of its Motion for Summary Judgment is

that Clark's failure to accommodate claim under the ADA and CFEPA fails because

Clark cannot show that Stop & Shop failed to accommodate his disabilities.  See Def.'s

MFSJ Mem. at 15 (Doc. No. 39).  More specifically, Stop & Shop argues that:  (1)

Clark's failure to accommodate claim is untimely; (2) Clark was responsible for the

breakdown of the interactive process; (3) Clark has failed to demonstrate that there was

a vacant position to which he could have been transferred that would have

accommodated his disabilities; and (4) evening shifts were an essential part of Clark's

job.  See id. at 15-20.  The court considers the merits of each of these contentions in

turn, ultimately concluding that none of these arguments entitle Stop & Shop to

judgment as a matter of law on Clark's failure to accommodate claim.

a.    Timeliness of Clark's Failure to Accommodate Claim

Stop & Shop first alleges that Clark's failure to accommodate claim is untimely,

and therefore barred, because "[t]he ADA required Clark to file a complaint with the

CHRO or EEOC within 300 days, and the CFEPA within 180 days" of the alleged failure

to accommodate, and these periods of time began to run in June 2012, when Clark

"requested transfer to a store closer to his home in a position working day shifts."  Id. at

15.  Stop & Shop contends that, because Clark's CHRO and EEOC complaints weren't

11

filed until April 2014, his failure to accommodate claims are necessarily untimely.  See id.; see also Pl.'s Opp. at 23 (Doc. No. 43) (noting that "[p]laintiff filed his CHRO and EEOC complaints simultaneously on April 9, 2014").  In response, Clark argues that his CHRO and EEOC complaints are timely because they were filed within 180 or 300 days, respectively, of "Stop & Shop's final and penultimate failure to accommodate his disability following Dr. Pomeraniec's last clarification of his request," which "occurred between November 13, 2013 and November 21, 2013."  Pl.'s Opp. at 23 (Doc. No. 43).

In an analogous context—failure to accommodate under Title VII—the Second Circuit has held that "an employer's rejection of an employee's proposed accommodation for religious practices does not give rise to a continuing violation" for statute of limitations purposes.  Elmenayer v. ABF Freight System, Inc., 318 F.3d 130, 134-35 (2d Cir. 2003).  In other words, an employer's rejection of an employee's request for a reasonable accommodation is a "discrete act" that triggers the running of the statute of limitations for a failure to accommodate claim.  Id. at 135.  District courts have "regularly applied Elmenayer to failure to accommodate claims under the ADA," finding that an employer's rejection of an employee's request for a reasonable accommodation starts the statute of limitations.  Gomez v. New York City Police Dep't, -- F. Supp. 3d ---, 2016 WL 3212108 at *6 (S.D.N.Y. June 7, 2016) (collecting cases).

The court's review of the record reveals multiple issues of material fact that preclude the granting of Stop & Shop's Motion for judgment as a matter of law on the ground that Clark's failure to accommodate claim was not timely filed.  Most crucially, and as noted above, the statute of limitations for failure to accommodate claims begins to run on the date on which an employer rejects an employee's request for a reasonable

accommodation, not the date on which the employee makes the request, because the statute of limitations analysis in these contexts should be "focuse[d] on the acts of the employer." Elmenayer, 318 F.3d at 135. Viewing the record in the light most favorable to Clark, the court concludes that a reasonable jury could find that Clark's accommodation request was not denied by Stop & Shop until November 2013, when Clark believed he had been terminated because the company was unwilling to accommodate his requests for day shifts and placement in a store within 20 miles of his home. To give but two examples of the facts in the record that could support this conclusion, Clark testified that, after he was transferred back to Stamford in 2012, he repeatedly asked a superior if he could be assigned day shifts. The supervisor did not tell him no, but rather "strung [him] along" by "sa[ying he'd] look into it and see" if the requested accommodation could be made. Clark Dep. at 42:6-13 (Doc. No. 39-2). Similarly, Clark testified that, in February 2013, he had a meeting with Pinard in which she represented that she could arrange for him to be placed in a store closer to his home if he took a brief leave of absence.[5] See Clark Dep. at 60:16-25 (Doc. No. 39-2). On the basis of these facts (and others like them) a reasonable juror could conclude that Stop & Shop did not reject Clark's request for a reasonable accommodation until November 2013, and therefore Clark's failure to accommodate claims were timely filed. Thus, Stop & Shop is not entitled to judgment as a matter of law on this ground.[6]

_____

[5] The court is well aware that Stop & Shop disputes this interpretation of Clark's deposition testimony. However, the court is not persuaded that Stop & Shop's characterization of Clark's deposition testimony is the only reasonable view of that testimony. This point is discussed at more length infra. See infra at 21 n.9.

[6] The court also notes that it has questions—which need not be resolved here—about whether Clark's repeated requests for reasonable accommodation each trigger the running of separate statutes of limitations, or whether all of the requests for reasonable accommodation relate back to Clark's first

b.      Breakdown of the Interactive Process

Stop & Shop next argues that it is entitled to summary judgment on Clark's failure to accommodate claim because Clark was responsible for the breakdown of the interactive process.  See Def.'s MFSJ Mem. at 16-17 (Doc. No. 39).  In making this argument, Stop & Shop assumes the truth of the facts it puts forward in support of its Motion for Summary Judgment, and conveniently ignores the fact that many, if not all, of the facts on which it relies for this argument are disputed by Clark.  Compare id. at 17-18, with Pl.'s L.R. 56(a)2 Stmt. at 7 ¶¶ 34-37 (Doc. No. 43-1) (denying Stop & Shop's account of interactions between Clark and Stop & Shop during Clark's medical leave and citing to record evidence in support of Clark's version of events).  Suffice it to say that there are genuine and disputed issues of material fact with respect to the question of who is responsible for any breakdown in the interactive process that may have occurred between Clark and Stop & Shop.  Accordingly, the court cannot grant summary judgment for Stop & Shop on this ground.

c.      Availability of Vacant Positions

Stop & Shop's third argument with respect to Clark's failure to accommodate claim is that it is entitled to judgment as a matter of law because Clark has not carried his burden of establishing that "there was a vacant position into which [ ]he might have been transferred" that would have accommodated his disabilities.  Jackan v. New York State Dept. of Labor, 205 F.3d 562, 567 (2d Cir. 2000).  However, Clark has alleged,

---

request for a reasonable accommodation for statute of limitations purposes in this case.  Compare Krachenfels v. N. Shore Long Island Jewish Health System, No. 13-cv-243 (JFB), 2014 WL 3867560 at *9 n.7 (E.D.N.Y. July 29, 2014) (concluding that a request to reconsider a denial of a request for a reasonable accommodation cannot extend the limitations period for ADA claims), with Fol v. City of New York, No. 01 Civ. 1115 (THK), 2003 WL 21556938 at *5 (S.D.N.Y. July 9, 2003) (viewing repeated requests for the same accommodation as discrete acts that trigger the running of separate statutes of limitations).

and Stop & Shop has admitted, that, while Clark was out on leave, a full-time produce clerk position opened in a Stop & Shop store in Fairfield, Connecticut.  <u>Compare</u> Compl. at 5 ¶ 36 (Doc. No. 1), <u>with</u> Answer at 4 ¶ 36 (Doc. No. 15).  Although this position would have been much closer to Clark's home, <u>see</u> Compl. at 5 ¶ 36 (Doc. No. 1), and would therefore have satisfied at least part of Clark's request for a reasonable accommodation in the form of a transfer and schedule change, Stop & Shop did not make Clark aware of the opening and instead promoted a part-time produce clerk to fill the position, <u>see</u> Answer at 4 ¶¶ 36-37 (Doc. No. 15).

Stop & Shop has not alleged that Clark was not qualified for the Fairfield position. Instead, Stop & Shop argues that the Fairfield position would not have been a suitable accommodation for Clark because it "was a 3:00 – 12:00 position."  Def.'s MFSJ Mem. at 20 (Doc. No. 39).  In other words, Stop & Shop contends that Clark's hours in Fairfield would have been the same as his hours in Stamford and, as a result, the Fairfield position would not have accommodated Clark's need to work no more than one night shift per week.  In response, Clark argues that "[t]here is no such position as a '3:00-12:00 produce clerk.'"  Pl.'s L.R. 56(a)2 Stmt. at 14 ¶ 93 (Doc. No. 43-1).

Clark has produced ample evidence to create a genuine issue of fact with respect to the question of whether Stop & Shop had a 3:00-12:00 produce clerk position.  To give but a few examples of the kind of evidence that exists on this point in the record, one Stop & Shop employee testified that full-time produce clerks would usually work one night per week, <u>see</u> Dep. of Terry McCaffrey ("McCaffrey Dep.") at 14:20-15:10 (Doc. No. 39-35), and Stop & Shop's job description for full-time produce clerks contains no mention of a requirement that many—if not all—full-time produce

clerks accept an all-night-shifts schedule, see Produce Clerk Essential Job Functions & Requirements (Doc. No. 43-32).  Furthermore, the transfer order for Clark's transfer from Darien to Stamford in 2012 specifies only that Clark is "hourly staff," not which shift he is assigned to work, see Clark Transfer Record (Doc. No. 43-7), and the deposition testimony of various Stop & Shop employees submitted by both parties support a general inference that Stop & Shop employees' schedules are drawn up on a week-to-week basis by managers who possess some flexibility in setting employees' schedules according to their needs.  This inference is additionally supported by the fact that Clark testified, and his prior supervisor confirmed, that he had generally been scheduled to work day shifts prior to his promotion to assistant produce manager of the Darien store. See Clark Dep. at 31:15-18 (Doc. No. 43-3) ("Because my previous position I was a day clerk before I had gotten promoted."); Dep. of Emilio Renzulli at 32:3-4 (Doc. No. 39-5).

In sum, the record presently before the court contains genuine issues of material fact on the question of whether, at the period of time relevant to this lawsuit, Stop & Shop classified its produce clerks such that some full-time clerks were hired to work exclusively night shifts throughout the course of the week (i.e., whether there was such a position as a 3:00-12:00 produce clerk).  Because the court concludes there are genuine disputes of fact relevant to this question, there remain genuine disputes of fact relevant to the question of whether the open produce clerk position in Fairfield was a 3:00-12:00 position.  If such a position exists and the Fairfield position was so categorized, Clark likely has not satisfied his burden of establishing that there was a reasonable accommodation in the form of a vacancy that would meet his needs and for which he was qualified and to which Stop & Shop could have transferred him.  However,

16

because the evidence presently before the court could lead a reasonable juror to conclude that there was no such thing as a 3:00-12:00 produce clerk, or that the Fairfield position was not so limited, a reasonable juror could conclude that Stop & Shop could have reasonably accommodated Clark by transferring him to Fairfield to fill the open, full-time produce clerk position for which he was otherwise qualified.  For the foregoing reasons, the court concludes that it cannot grant summary judgment for Stop & Shop on the ground that Clark has failed to establish that there was a vacancy to which he could have been transferred.

d.    Necessity of Evening Shifts

Finally, Stop & Shop argues that it is entitled to summary judgment on Clark's failure to accommodate claim because evening shifts "were an essential part of Clark's job as a full-time 3:00-12:00 produce clerk."  Def.'s MFSJ Mem. at 20 (Doc. No. 39). The court has already concluded that there are genuine issues of material fact with respect to whether the position of 3:00-12:00 produce clerk even existed, as well as evidence in the record that Clark and other full-time produce clerks at Stop & Shop had, on prior occasions, been scheduled to work no more than one night shift per week.  See supra at 15-17.  On the basis of that same evidence, and for the same reasons, the court now concludes that there are genuine issues of material fact with respect to whether working exclusively night shifts was an essential component of Clark's position as a full-time produce clerk such that Stop & Shop is not entitled to summary judgment on this ground.

3.      Whether Clark was Terminated Because of his Disability

Stop & Shop's final argument in support of its Motion for Summary Judgment on

Count One of Clark's Complaint is that Clark cannot establish the fourth element of a

discriminatory discharge claim, namely that he was actually or constructively terminated

because of his alleged disability.  See Def.'s MFSJ Mem. at 21 (Doc. No. 39).  Upon

careful review of the record, the court again concludes that there are disputed issues of

fact relevant to the resolution of this element of Clark's claim.  The parties have wildly

different accounts of what transpired between them from February 2013 through June

2014.  Stop & Shop contends that Clark requested FMLA leave; that Clark failed to

provide Stop & Shop with requested information about his medical conditions and the

nature of the accommodation he required while he was on leave; and that Clark was

ultimately terminated in June 2014 for abandoning his job after he failed to respond to

numerous letters from Stop & Shop.  See Def.'s L.R. 56(a)1 Stmt. at 4 ¶ 28 – 11 ¶ 87

(Doc. No. 40).  Clark contends that Pinard told him he had to take leave while she

worked on securing him a position that would accommodate his disabilities; that he

provided all of the information Stop & Shop requested in a timely manner; and that he

was ultimately terminated in November 2013 because of his disabilities and Stop &

Shop's unwillingness to accommodate him.  See Pl.'s L.R. 56(a)2 Stmt. at 6 ¶ 28 – 14 ¶

87 (Doc. No. 43-1).  There is evidence in the record that tends to support each party's

claims.[7]  For example, the letter Clark received in November 2013 does not explicitly

---

[7] The court notes that, if a jury accepts Clark's version of events, they would necessarily reject
the legitimate, non-discriminatory reason for Clark's termination proffered by Stop & Shop, namely that
he abandoned his job by failing to respond to letters sent by Stop & Shop in the spring and summer of 2014.
See Def.'s L.R. 56(a)1 Stmt. at 11 ¶ 87 (Doc. No. 40); see also Def.'s MFSJ Mem. at 26 (Doc. No. 39).  In
other words, if the jury believes Clark that he was either constructively discharged or terminated by Stop
& Shop in the fall of 2013, that determination will necessarily cause them to reject Stop & Shop's

say that Clark was being terminated, which tends to support Stop & Shop's view that Clark was still an employee at that time.  See Letter from Stop & Shop to Gary Clark (Doc. No. 39-23) (dated November 15, 2013, and informing Clark that he must "submit appropriate documentation to support [his] continued absence").  On the other hand, Clark applied for, and received, unemployment benefits in the fall of 2013, and the benefits adjudicator noted that Clark was eligible for benefits because Clark "was discharged because the employer was unable to accommodate his medical restrictions."  Fact Finding Report (Doc. No. 43-23).[8]  This evidence—and additional evidence like it contained in the record—makes clear that there remain genuine issues of material fact around the question of when, why, and how Clark was terminated or discharged from his position at Stop & Shop.  In light of these disputes, and because the court must draw all reasonable inferences in Clark's favor, the court concludes that Stop & Shop is not entitled to summary judgment on the ground that Clark has failed to establish the fourth element of a discriminatory discharge claim.

For the foregoing reasons, the court concludes that there are genuine issues of material fact relevant to resolution of Clark's claim of discriminatory discharge and

---

allegedly legitimate, nondiscriminatory reason for terminating Clark, namely his failure to respond to letters sent to him after the date on which he was constructively discharged or terminated.  Stop & Shop has not articulated a legitimate, nondiscriminatory reason for Clark's termination other than job abandonment.

[8] The court is aware that Stop & Shop did not contest Clark's application for unemployment benefits, which means this conclusion appears primarily to be based upon Clark's self-report to the unemployment benefits adjudicator.  See Fact Finding Report (Doc. No. 43-23).  In the court's view, this fact cuts both ways:  on the one hand, the fact that Clark is self-reporting his termination means the fact that he received unemployment benefits is perhaps less compelling evidence that Clark was terminated than an award of benefits after a contested hearing would be; on the other hand, there is a reasonable inference in Clark's favor to be drawn from the fact that Stop & Shop did not contest an unemployment benefits application filed by an employee who Stop & Shop now alleges it believed was still on its payroll at the time the application was filed.

failure to accommodate under the ADA and CFEPA.  Accordingly, the court denies Stop & Shop's Motion for Summary Judgment (Doc. No. 38) with respect to these claims.

### B.     Count Two: Negligent Misrepresentation

Clark's second claim is for negligent misrepresentation.  See Compl. at 8 (Doc. No. 1).  In Connecticut, negligent misrepresentation requires a plaintiff to demonstrate, by a preponderance of the evidence:  "(1) that the defendant made a misrepresentation of fact (2) that the defendant knew or should have known was false, and (3) that the plaintiff reasonably relied on the misrepresentation, and (4) suffered pecuniary harm as a result."  Stuart v. Freiberg, 316 Conn. 809, 822 (2015) (internal quotations and citation omitted).  "[E]ven an innocent misrepresentation of fact may be actionable if the declarant has the means of knowing, ought to know, or has the duty of knowing the truth."  Glazer v. Dress Barn, Inc., 274 Conn. 33, 72-73 (2005) (internal quotations and citation omitted).  In addition, Connecticut courts recognize that "a promise to do an act in the future, when coupled with a present intent not to fulfil the promise, is a false representation."  Paiva v. Vanech Heights Const. Co., 159 Conn. 512, 515 (1970).

Clark's claim of negligent misrepresentation is premised upon his allegation that, in late February 2013, Pinard and Silver told Clark to take FMLA leave while they worked on finding him an appropriate placement that would accommodate his disabilities (i.e., a day-shift position closer to his home).  See Pl.'s Opp. at 32 (Doc. No. 43); Clark Dep. at 60 (Doc. No. 43-3).  Clark contends that, at the time Pinard made this promise, she had no intention of accommodating Clark, and in fact used his medical leave as an opportunity to force him out.  See Pl.'s Opp. at 32 (Doc. No. 43).  Drawing all inferences in Clark's favor, this allegation could be supported by the fact that Stop &

Shop failed to communicate to Clark that there was an open produce clerk position in the Fairfield store while he was on leave.  See Compl. at 5 ¶ 36 (Doc. No. 1); Answer at 4 ¶ 36 (Doc. No. 15) (admitting that a produce clerk position in Fairfield became available while Clark was on leave and that Stop & Shop did not make Clark aware of the opening).  Clark alleges that the fact that Pinard asked him to take leave when she had no intention of accommodating him resulted in pecuniary loss to him in the form of lost wages and employment benefits.  See Compl. at 8 (Doc. No. 1).

As with Clark's first claim, the record submitted by the parties compels the conclusion that there are genuine issues of material fact with respect to this claim and that, as a result, summary judgment is inappropriate.  Because Clark and Pinard have wildly divergent accounts of what was said in their meeting at the end of February 2013, resolving whether Clark is entitled to relief for his negligent misrepresentation claim turns, in large part, on a credibility determination.  If a jury credited Clark's account of his meeting with Pinard—a real possibility, given that there are facts in the record presently before the court that could tend to bolster Clark's version of events—it could reasonably be concluded that Clark has proven the elements of a negligent misrepresentation claim under Connecticut law.  Deciding whether Clark's or Pinard's version of events is more believable is precisely the kind of action reserved for the jury at trial, not for the court at the summary judgment stage.[9]  Thus, Stop & Shop's Motion for judgment as a matter of law with respect to this claim is denied.

_____

[9] The court notes that, in this section of its Memorandum and elsewhere, Stop & Shop makes much of the fact that Clark "admit[ted]" that "Pinard said only that 'she would look into whether or not she could get [Clark] a position closer to home.'"  Def.'s MFSJ Mem. at 28 (Doc. No. 39) (quoting Clark Dep. at 170 (Doc. No. 39-2)).  Stop & Shop appears to be trying to persuade the court that Clark agrees with Pinard's version of events—i.e., that he said she only said she would look into transferring him, not that she would definitely be able to do it—such that there are no genuine disputes about issues of material

C.      Count Three: FMLA Retaliation

The FMLA entitles covered employees to "a total of 12 workweeks of leave during any 12-month period for . . . a serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D).  Clark's third claim in this lawsuit is that Stop & Shop unlawfully retaliated against him for exercising his rights under the FMLA.  See Compl. at 8-9 (Doc. No. 1). The Second Circuit analyzes FMLA retaliation claims under the McDonnell Douglas burden-shifting framework.  See Potenza v. City of New York, 365 F.3d 165, 167-68 (2d Cir. 2004).  "Under the McDonnell Douglas framework, once a plaintiff makes out a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action."  O'Reilly v. Consolidated Edison Co. of New York, Inc., 173 F. App'x 20, 22 (2d Cir. 2006).  "If the defendant produces evidence of such a reason, the plaintiff must show that the defendant's reason is merely a pretext for discrimination."  Id.

In its Motion for Summary Judgment, Stop & Shop contends that Clark has failed to make out a prima facie case of FMLA retaliation because he has not set forth facts sufficient to establish the fourth element of his claim, namely that "the adverse employment action [Clark suffered] occurred under circumstances giving rise to an

---

fact that stem from the February 2013 meeting.  The court is not persuaded.  Although in his deposition testimony Clark does, in fact, agree with defense counsel's characterization of what Pinard promised as being that "she would look into whether or not she could get [him] a position closer to home," Clark Dep. at 170:7-11 (Doc. No. 39-2), he also testified that Pinard "said she would move [him] closer to home," id. at 169:25-170:1, see also id. at 60:16-18 ("I remember her saying while you're out I'll put you in a store close to home . . . ."), and he clarified that, whatever Pinard's exact words with respect to the representation were, "[s]he made it sound like she could do it," id. at 60:21.  Drawing all inferences in Clark's favor, this testimony could plausibly be taken to establish that Clark thought Pinard had promised him an accommodation in the form of a transfer to a store closer to his home if he took a brief leave so that she could work out where he should go.

22

inference of retaliatory intent." Potenza, 365 F.3d at 168; Def.'s MFSJ Mem. at 30-31 (Doc. No. 39).  In the alternative, Stop & Shop argues that it had a legitimate, non-retaliatory reason for Clark's termination, namely that he abandoned his job when he didn't respond to correspondence sent to him by Stop & Shop in the late spring and early summer of 2014.  See Def.'s MFSJ Mem. at 31 (Doc. No. 39).  In response, Clark contends that there is "enough evidence in the record to demonstrate that Stop & Shop terminated Clark in contemplation of, and specifically because of, his decision to take leave."  Pl.'s Opp. at 35 (Doc. No. 43).  In support of this allegation, Clark cites to evidence in the record he contends shows, inter alia, that "just three days after [Clark] formally submitted his application for FMLA leave, Pinard was contemplating terminating him."  Id.

Although the Second Circuit has recognized that "close temporal proximity" between the exercise of an employee's rights under the FMLA and his termination "can give rise to an inference of retaliation," O'Reilly, 173 F. App'x at 22, the court concludes that such an inference does not arise on the facts of this case.  Even assuming arguendo that Clark will be able to establish that he was constructively discharged or terminated in November 2013 (instead of June 2014, as Stop & Shop claims), five months elapsed between the expiration of Clark's FMLA-protected leave and the date of his termination.  Although this additional leave was approved by Stop & Shop and appears to have been permitted under company policy, the fact remains that Clark continued to be employed by Stop & Shop for nearly half a year following the exhaustion of his leave time under the FMLA.  In a case with closely analogous facts, the Second Circuit determined that a "three month gap between [an employee's] FMLA

leave and her termination [was] not sufficient to give rise to an inference of retaliation in light of the additional leave time [the employer's] policy allowed." Id.; see also Reilly v. Revlon, Inc., 620 F. Supp. 2d 524, 538 (S.D.N.Y. 2009) ("While being fired during FMLA leave is certainly enough to create a prima facie inference of retaliation for exercising a FMLA right . . . a three-month gap between the expiration of an employee's FMLA leave and termination is likely to be insufficient to give rise to an inference of retaliation . . . ."). So too, here.

The court also rejects Clark's contention that the record shows that "Pinard was contemplating terminating him" within a week of his decision to take FMLA leave, and that this fact gives rise to an inference of retaliatory intent. Pl.'s Opp. at 35 (Doc. No. 43). The single piece of evidence on which Clark relies for this argument is a set of emails between Pinard and another Stop & Shop employee. See Email from Julie Pinard to Joe Defrancesco (Doc. No. 43-33). In that email, the other employee asks Pinard what will happen if Clark's FMLA paperwork is incomplete. See id. ("What happens if he doesn't have the proper information?"). Pinard replies, "[t]hen we let him know he needs to return to work or we term him." Id. As Stop & Shop argues, this exchange does not establish (or even support an inference) that Pinard was contemplating terminating Clark as he began his FMLA leave, because her statement was clearly in response to a question from a coworker about what would happen in the event that Clark's FMLA paperwork was deficient. In other words, Pinard's statement was not an expression of animus, but rather conveyed requested information about what would happen in the hypothetical situation where there was a problem with Clark's FMLA paperwork. This hypothetical situation did not come to pass: the record makes

clear that Clark's FMLA paperwork was not deficient, his leave was approved, and Stop & Shop did not terminate him until November 2013 (at the earliest).  No other evidence in the record tends to show, or gives rise to an inference that, Pinard or other Stop & Shop employees contemplated terminating, or actually terminated, Clark in retaliation for his decision to exercise his rights under the FMLA.

In sum, Clark has failed to meet his burden of establishing the fourth element of his prima facie case for FMLA retaliation, namely that the adverse employment action he suffered "occurred under circumstances giving rise to an inference of retaliatory intent."  Potenza, 365 F.3d at 168.  Because Clark has failed to make out a prima facie case of FMLA retaliation, Stop & Shop's Motion for Summary Judgment on this claim is granted.

D.    Count Four: FMLA Interference

Clark's final claim is for interference with his rights under the FMLA.  See Compl. at 9 (Doc. No. 1).  The FMLA states that it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."  29 U.S.C. § 2615(a)(1).  Among the substantive rights that are protected by the FMLA is the right "on return from [FMLA] leave . . . to be restored by the employer to the position of employment held by the employee when the leave commenced; or . . . to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment."  29 U.S.C. § 2614(a)(1)(A)-(B); see also 29 C.F.R. § 825.214.

The Second Circuit has recently made clear that, to prevail on his claim of FMLA interference, Clark would need to show the following:  "(1) that [ ]he is an eligible employee . . . ; (2) that the defendant is an employer as defined by the FMLA; (3) that [ ]he was entitled to take leave under the FMLA; (4) that [ ]he gave notice . . . of h[is] intention to take leave; and (5) that [ ]he was denied benefits to which [ ]he was entitled . . . ."  Graziadio v. Culinary Institute of America, 817 F.3d 415, 424 (2d Cir. 2016).  The parties do not appear to dispute that the first four elements are met by the facts of this case, and instead focus on the fifth element, i.e., whether Clark was denied benefits to which he was entitled under the FMLA.  See Def.'s MFSJ Mem. at 33-34 (Doc. No. 39); Pl.'s Opp. at 33-34 (Doc. No. 43).

Whether the record currently before the court contains genuine issues of material fact with respect to Clark's FMLA interference claim is a close question.  Ultimately, however, the court concludes that there are triable issues of fact on this claim created by the record.  More specifically, the court notes that Clark has produced notes from his doctor that indicate that Clark would be able to return from his leave when he could "return back to work during days, not at night."  Dr. Pomeraniec Note #1 (Doc. No. 43-9) (dated April 29, 2013).  Given that the court has already concluded that there are fact issues around the question of whether Stop & Shop had a produce clerk position that required exclusively night shifts (i.e., whether Stop & Shop had a 3:00-12:00 produce clerk position at all), the notes Clark has produced from his doctor are arguably a request to be reinstated to his prior position, i.e., a general produce clerk position.  Clark's additional request that he not be scheduled to work nights is possibly a request for an accommodation, but if he is correct that Stop & Shop did not hire specific people

26

for specific shifts (again, if he is able to prove that there was no such thing as a "3:00-12:00 produce clerk"), the request for this accommodation does not transform Clark's request to return to work to a request to be put in a different job.  In fact, if Clark is able to prove that Stop & Shop did not have a "3:00-12:00 produce clerk position," his scheduling request is arguably not even a request for an accommodation, but instead is a request that Clark be treated like the other full-time produce clerks, i.e., put on a schedule that would require him to work one night shift per week, see McCaffrey Dep. at 14:24-15:14 (Doc. No. 43-35) ("And the three full-timers would work, uh, usually one night.").

Separately, the court also notes that at least some of the notes provided by Dr. Pomeraniec during Clark's FMLA leave, see, e.g., Dr. Pomeraniec Note #1 (Doc. No. 43-9) (dated April 29, 2013), do not contain any mention of Clark's return to work being conditioned on his being transferred to a different store.  This, too, supports the court's determination that the record presently before the court could support a conclusion that Clark requested to be returned to his general produce clerk position during the course of his FMLA leave, and that Stop & Shop did not honor this request.  If Clark were able to prove this set of facts, he could be entitled to relief on his FMLA interference claim. Thus, the court concludes that there are genuine issues of material fact relevant to the resolution of Clark's FMLA interference claim.  Stop & Shop's Motion for Summary Judgment (Doc. No. 38) on this claim is therefore denied.

## V.   CONCLUSION

For the foregoing reasons, the court **GRANTS IN PART** and **DENIES IN PART** Stop & Shop's Motion for Summary Judgment (Doc. No. 38).  The court concludes that

there are genuine issues of material fact with respect to Clark's first, second, and fourth claims (for discriminatory discharge and failure to accommodate; negligent misrepresentation; and FMLA interference), and therefore denies Stop & Shop's Motion for Summary Judgment on these claims.  However, the court grants Stop & Shop's Motion for Summary Judgment on Clark's third claim (FMLA retaliation).  The case will proceed to trial on the remaining claims.

**SO ORDERED.**

Signed at New Haven, Connecticut, this 15th day of August, 2016.

_____/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge